UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

FAHEEM ABDUR-RAZZAAQ,                          :

                Plaintiff,        :

      - against -                     :               12 Civ. 7350 (LTS) (FM)

CAROLYN COLVIN, Acting Commissioner  :
of the Social Security Administration,
                             :
                Defendant.
----------------------------------------------------------x


## OPINION AND ORDER


      Plaintiff Faheem Abdur-Razzaaq ("Abdur-Razzaaq") brings this action pursuant

to Section 405(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a

final decision of the Commissioner of the Social Security Administration ("Commissioner")[1]

denying his application for a period of disability insurance benefits ("DIB").  The parties have

filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure.  For the reasons set forth below, the Commissioner's motion, (ECF No. 14), is

granted and Abdur-Razzaaq's motion, (ECF No. 12), is denied.

---

[1]      The complaint in this action named Michael J. Astrue as the defendant.  (ECF No.
1).  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk of
Court is directed to correct the caption to reflect the name of the current acting
Commissioner, as shown above.

I.      Procedural Background

On June 28, 2006, Abdur-Razzaaq filed an application for a period of monthly DIB payments, alleging disability as of January 3, 2005.  (Tr. 172-76.)[2]  He later amended the alleged onset date to November 6, 2005.  (Id. at 62.)  In his application, Abdur-Razzaaq alleged that he was disabled because he suffered from constant head, back and neck pain stemming from a herniated disc and degenerative disc disease.  (Id. at 65-66, 90, 193-94, 221-22.)  The Commissioner initially denied Abdur-Razzaaq's application on June 18, 2007.  (Id. at 117, 120-23.)  After retaining counsel, Abdur-Razzaaq requested a de novo hearing before an administrative law judge ("ALJ").  (Id. at 124.)  On August 7, 2008, ALJ Kenneth G. Levin ("ALJ Levin") held the requested hearing.  (Id. at 59-85.)  Thereafter, on September 30, 2008, the ALJ issued a written decision concluding that Abdur-Razzaaq was not disabled within the meaning of the Act.  (Id. at 152-59.)

Abdur-Razzaaq requested review of the ALJ's initial decision, which the Appeals Council granted on May 6, 2010.  (Id. at 160, 166-69.)  Upon review, the Appeals Council remanded Abdur-Razzaaq's claim to the ALJ, directing him to obtain updated medical evidence from Abdur-Razzaaq's treating sources, to consider any of the treating source's opinions pursuant to 20 C.F.R. § 404.1527, SSR 96-2p and 96-5p, and to explain the weight afforded to any such evidence in reaching his disability determination.  (Id. at 168-69.)

On March 11, 2011, ALJ Levin held a second administrative hearing as directed by the Appeals Council.  (Id. at 86-116.)  Abdur-Razaaq again was represented by counsel.  On March 24, 2011, after considering the case de novo, the ALJ again determined that Abdur-

---

[2]      Citations to "Tr." refer to the certified copy of the administrative record filed with the answer.  (ECF No. 8).

Razzaaq was not disabled within the meaning of the Act.  (Id. at 22-30.)  The ALJ's decision became final on August 15, 2012, when the Appeals Council denied Abdur-Razzaaq's request for review.  (Id. at 1-4.)

Abdur-Razzaaq then commenced this action on October 1, 2012.  (ECF No. 1.) On May 31, 2013, Abdur-Razzaaq filed a motion for judgment on the pleadings.  (ECF No. 12.) On June 21, 2013, the Commissioner cross-moved for judgment on the pleadings.  (ECF No. 14.) Abdur-Razzaaq filed his reply papers on June 28, 2013.  (ECF No. 16.)  Both motions are fully submitted.

The issue presented by the two motions is whether the ALJ's determination that Abdur-Razzaaq was not disabled within the meaning of the Act on or after November 6, 2005, is legally correct and supported by substantial evidence.

II.     Factual Background

A.     Non-Medical Evidence

Abdur-Razzaaq was born on December 6, 1968, making him thirty-seven years old at the time of his application for disability benefits.  (Tr. 242.)  By the time of his first hearing in 2008, he had enrolled at The City College of New York and was working to obtain his bachelor's degree.  (Id. at 93-94.)  In 2010, he withdrew from classes because he allegedly was suffering from severe pain in his back and neck that made it too difficult to attend school full-time.  Later that year, however, he adjusted his schedule so that he only had to attend classes twice per week, and only in the afternoon.  (Id. at 94-95.)  This allowed him to take his pain

medication more frequently, since he usually avoided his medication on school days because it caused him to become drowsy.  (Id. at 96-97.)

Abdur-Razzaaq lived in a high-rise apartment with his wife and three young children.  (Id. at 68, 97-99, 213.)  He generally took on most of the family's childcare responsibilities, walking his two older children to and from school every day and caring for his youngest child at home.  (Id. at 214.)  In his application, Abdur-Razzaaq indicated that, although he generally did not cook, he took care of other household chores such as laundry, taking out the garbage, and washing dishes.  (Id. at 98, 215-16.)  However, at the two hearings before ALJ Levin, he claimed that he did not do any significant household chores, other than occasionally ironing clothes.  (Id. at 77, 98-101.)  He was able to drive short distances on his own, and often did so to buy groceries, go to doctor's appointments, and attend classes.  (Id. at 96, 216-17.) According to his application, he did not often socialize with others, but he did go out to dinner or a movie about once or twice per month.  (Id. at 216, 218.)

From 1994 to 1998, Abdur-Razzaaq worked at the New York City Housing Authority, first as a maintenance staff member, then later as a heating plant technician.  (Id. at 75-76.)  In 1998, while working at the heating plant, he sustained an injury to his head, back and neck when a coworker accidentally turned on a fire hose that he was holding, causing him to be slammed into a wall.  (Id. at 303, 494.)  Following this injury, Abdur-Razzaaq left his job and applied for Workers' Compensation benefits, which he received from 1998 until 1999.  (Id. at 90.)

In 1999, Abdur-Razzaaq started a new job at a not-for-profit community technology center, where he started as a computer instructor and later was promoted to office

manager.  (Id. at 74-75.)  As the office manager, Abdur-Razzaaq supervised seventeen staff

members, managed payroll and billing responsibilities, maintained computer hardware and

software, and addressed technical problems.  (Id. at 194-95.)  Although he always tried to "put []

100 percent" into his job, he testified that he had "a lot of bad days" because he was in so much

pain from his 1998 injury.  (Id. at 70.)  While at work, he often had to take breaks to lay down on

a couch, and occasionally had to leave work to rest at home.  (Id.)  He further complained that he

could sit for no more than one hour at a time before having to stand up and move around due to

his pain.  (Id. at 67.)

       Abdur-Razzaaq eventually left his job at the technology center in 2005, when the

center closed down due to lack of funding.  (Id. at 74-75.)  He then began working a temporary

part-time job as a freelance computer installer and repairman for the Board of Education.  (Id. at

61-62, 91.)  However, on November 5, 2005, while sweeping the floors of his house, Abdur-

Razzaaq's back cracked, causing him to fall to the floor in pain.  (Id. at 62, 91.)  Following this

accident, which he claims exacerbated his 1998 work injury, Abdur-Razzaaq left his part-time

job and stopped working altogether.  (Id. at 91.)

       At the two hearings before ALJ Levin, Abdur-Razzaaq complained of chronic

pain in his head, neck, and lower and mid-back, all stemming from his 1998 work injury.  (Id. at

65-66, 90.)  He claimed that, because Worker's Compensation denied coverage for his lower and

mid-back injuries, he had not received treatment for his back until 2007, some nine years after

the accident.  During those nine years, Abdur-Razzaaq's back pain had gradually worsened,

reaching its peak in 2005 when he threw out his back in his home.  (Id. at 70-71, 91-92.)  Since

then, his pain had improved with the help of epidural injections and physical therapy, although

the effectiveness of those treatments had begun to diminish over time.  (Id. at 63-65, 93.)  To

cope with his pain, Abdur-Razzaaq took Diclofenac, an anti-inflammatory medication, and

Noratriptyline, an anti-depressant that helped him sleep at night.  (Id. at 92.)

When asked to describe his discomfort, Abdur-Razzaaq explained that his neck

pain was constant but "not constantly high."  (Id. at 65.)  He suffered pain and numbness in his

left arm approximately twice per week, which he claimed made it impossible for him to lift any

more than twenty to thirty pounds while standing.  (Id. at 69, 102.)  He described his leg pain as

a "buzzing sensation down the back of [his] thigh, [that] ends at right about the knee."  (Id. at

66.)  As a result of his leg pain, Abdur-Razzaaq estimated that he could stand for no more than

two hours at a time and could walk only about ten city blocks.  (Id. at 67, 100.)  Although he had

not noticed it himself, Abdur-Razzaaq testified that family members had told him that he

dragged his left leg when walking and had poor coordination.  (Id. at 67.)

Abdur-Razzaaq further testified that he has trouble sitting for long periods of time

due to the pain in his neck and back.  During the first hearing, he indicated that he could sit for

less than one hour at a time, but could not sit through an entire movie. (Id. at 67.)  By his second

hearing, he indicated that he could sit for two to three hours at a time without standing up or

changing positions, and that he could do that approximately three or four times throughout the

day.  (Id. at 100.)  When asked whether he could perform a sedentary job that required him to sit

for two hours at a time with five to ten minute breaks in between, Abdur-Razzaaq said that he

could not because his pain rarely, if ever, dissipated in five to ten minutes.  (Id. at 103.)  He did,

however, testify that he might be able to perform a part-time job if he had the option to sit and

stand at will, and could take ten to fifteen minute breaks to "walk [] off" the pain.  (Id. at 104-106.)

      B.    <u>Medical Evidence</u>

         1.    <u>Treating Sources</u>

            a.    <u>Dr. Astaire K. Selassie</u>

Following his workplace accident in 1998, Abdur-Razzaaq visited a pain management specialist, Astaire K. Selassie, M.D., complaining of pain in his neck and lower back.  (Id. at 312.)  Dr. Selassie continued to treat these injuries for the next two years, but then did not see Abdur-Razzaaq again until July 13, 2005, when he returned for treatment after a five year hiatus.  (Id.)  During this return visit, Abdur-Razzaaq complained that the pain in his lower back had increased and had spread down his left leg.  He indicated that his pain was worse at the end of each day, and sometimes interrupted his sleep.  (Id.)

Upon examining Abdur-Razzaaq, Dr. Selassie noted that he experienced pain when flexing his spine to 45 degrees and extending his spine to 5 degrees.  She further noted that his straight leg raising ("SLR") test results were positive bilaterally.  (Id.)[3]  Following this initial re-evaluation, Dr. Selassie opined that Abdur-Razzaaq was "permanently partially disabled from disc herniation sustained in his work injury in 1998."  (Id.)

Dr. Selassie saw Abdur-Razzaaq a number of times over the following year.  In August 2005, following one month of drug treatment, Abdur-Razzaaq reported a fifty percent

---

[3]    The SLR test helps physicians identify the presence of lumbar disc protrusions and herniations.  <u>See</u> <u>Braithwaite v. Barnhart</u>, 04 Civ. 2850 (GBD) (DF), 2007 WL 5322447, at *3 n.4 (S.D.N.Y. Dec. 20, 2007) (citing 5-15 Attorney's Dictionary of Medicine (Third Edition) P 15.34(1) (2007)).

improvement in his pain levels.  (Id. at 313.)  However, on November 9, 2005, he reported to Dr.

Selassie that he had gone to the emergency room over the weekend after throwing out his back.

Dr. Selassie characterized Abdur-Razzaaq's pain as "severe" at that time.  (Id. at 314.)

By December 2005, following further drug treatment, Abdur-Razzaaq reported to

Dr. Selassie that his pain had again improved.  Upon examination, Abdur-Razzaaq was able to

flex his spine forward 90 degrees without experiencing pain, although he still experienced pain

during the SLR test.  (Id. at 315.)

Dr. Selassie again saw Abdur-Razzaaq in January and April 2006.  During those

visits, Abdur-Razzaaq reported that his pain had improved after taking the anti-inflammatory

drugs that Dr. Selassie had prescribed.  (Id. at 316-17.)  He nonetheless continued to experience

discomfort when extending his spine and when performing the SLR test.  In Dr. Selassie's

opinion, Abdur-Razzaaq's "chronic disc herniation ha[d] led to wear and tear on his facet joints"

and he likely would "require pain relief for the rest of his life."  (Id. at 316.)

In June and July 2006, Abdur-Razzaaq reported an exacerbation in his symptoms,

including increased back and neck pain.  Range of motion testing from that time period indicated

that he could flex his spine forward only to 45 degrees, and could extend it only to 25 degrees.

(Id. at 318.).  To help alleviate his pain, Dr. Selassie administered two epidural steroid injections

in August 2006.   On October 9, 2006, Dr. Selassie noted that the injections had relieved Abdur-

Razzaaq's back pain, at least for the time being.  (Id. at 320-22.)  He continued, however, to

experience neck pain.  (Id. at 322.)  Noting limitations in the lateral rotation of his cervical spine,

Dr. Selassie ordered that Abdur-Razzaaq undergo a cervical MRI to detect any abnormalities.

(Id.)

The results from Abdur-Razzaaq's December 4, 2006 MRI revealed multilevel spondylosis[4] with spinal canal and foraminal stenosis[5] at the C3-C4 through C5-C6 levels.  At the C5-C6 level, the examiner observed a central herniated disc that had caused focal narrowing of the thecal sac and spinal cord deformity.  The results did not show any obvious evidence of spinal cord edema.  (Id. at 324.)

Dr. Selassie saw Abdur-Razzaaq again on December 8, 2006.  She noted that he currently was experiencing increased neck pain, and also had pain when extending his spine forward to 5 degrees and when laterally rotating his spine to 25 degrees in both directions.  (Id. at 325.)  Nearly two months later, on January 26, 2007, Dr. Selassie observed that Abdur-Razzaaq's neck pain had radiated down his arm and was limiting his cervical range of motion in all directions.  (Id. at 326.)  Though his exacerbated neck pain somewhat improved over the next few weeks, (id. at 327), Abdur-Razzaaq continued to experience some degree of neck pain until October 2007, when he received an additional steroid injection that helped relieve his pain, (id. at 327-34).  He also continued to report back pain when extending and flexing his spine and occasionally when performing SLR tests.  (Id. at 328-34.)

On April 17, 2007, Dr. Selassie completed a Spinal Impairment Questionnaire in which she diagnosed Abdur-Razzaaq with cervical radiculopathy,[6] cervical disc and lumbar disc herniation, and lumbar facet joint arthritis.  (Id. at 370.)  She noted limited range of motion and

---

[4]     Spondylosis refers to degenerative lesions in the spine.  See Stedman's Medical Dictionary ("Stedman's").

[5]     "Stenosis" generally refers to narrowing of any canal or orifice in the body.  Stedman's.  Foraminal stenosis refers to narrowing of the opening through which the nerve root exits the spinal canal.  Id.

[6]     Radiculopathy refers to a disease of the nerve roots.  Stedman's.

tenderness in Abdur-Razzaaq's cervical and lumbar spine, but did not report any muscle spasm, sensory loss, reflex changes, muscle atrophy, muscle weakness, abnormal gait, or crepitus.[7]  Dr. Selassie indicated that Abdur-Razzaaq's "primary symptom" was his chronic intermittent pain in the lumbar area, which was precipitated by bending and lifting.  (Id. at 372-73.)  She noted that she currently prescribed various pain relievers and anti-inflammatory medications, including Voltaren, Nortriptylene, Rolafen, and Vicodin, as well as steroid injections and physical therapy to help ease Abdur-Razzaaq's symptoms.  (Id. at 374.)   Even with these treatments, however, Dr. Selassie reported that she could not completely eliminate Abdur-Razzaaq's pain.  (Id. at 373.)

As a result of his pain, Dr. Selassie opined that Abdur-Razzaaq would be able to sit for only one hour during an eight hour work day, and could stand and walk for less than one hour.  (Id.)  She further opined that, if he were to work full time, he would need to stand up and move around every fifteen minutes for at least twenty minutes at a time.  (Id.)  Dr. Selassie recommended that Abdur-Razzaaq avoid lifting and carrying  more than twenty pounds, and that he lift and carry lighter objects only occasionally.  (Id. at 373-74.)  She further advised that Abdur-Razzaaq avoid jobs that require, pushing, pulling, kneeling, bending, stooping, or continuous periods of sitting, standing or walking.  (Id. at 373, 376.)  Finally, Dr. Selassie indicated that Abdur-Razzaaq could not keep his neck in a constant position for long periods of time, as would be required by any job involving computer work.  (Id. at 375.)

---

[7]      In this context, crepitus refers the "grating of a joint, often in association with osteoarthritis."  Stedman's.

With respect to Abdur-Razzaaq's work environment, Dr. Selassie indicated that he could handle only low to moderate levels of stress because his pain often interfered with his attention and concentration levels.  (Id. at 375-76.)  She further recommended that he avoid wet or humid work environments.  (Id. at 376.)

Overall, Dr. Selassie opined that Abdur-Razzaaq's condition would prevent him from sustaining a full-time job, and that if he did work full-time, he likely would miss three to four days of work per month due to his pain.  In any work situation, Dr. Selassie indicated that Abdur-Razzaaq would have good and bad days.  (Id. at 375.)

Following this assessment, Abdur-Razzaaq continued to report to Dr. Selassie for regular treatment.  On January 2, 2008, Dr. Selassie reported that Abdur-Razzaaq was experiencing increased pain in his left lower back that now radiated down to his lower leg.  (Id. at 335.)  Abdur-Razzaaq showed positive SLR test results and limited range of motion in his lumbar spine.  (Id.)  Dr. Selassie reported similar findings later that month.  (Id. at 336.)  In a report dated January 28, 2008, Dr. Selassie indicated that, since 1998, Abdur-Razzaaq's "physical examination [was] essentially unchanged."  (Id.)  She once again opined that Abdur-Razzaaq was permanently disabled as a result of his 1998 work injury, which was "the direct cause of the facet joint arthritis in his neck and [his] low back pain secondary to disc herniation." (Id.)

On January 31, 2008, Abdur-Razzaaq underwent a lumbar MRI.  Results from that MRI showed mild to moderate degeneration and mild disc bulging at the L5-S1 level, and a superimposed midline left paramedian disc herniation with mild mass effect on the descending left S1 nerve root.  (Id. at 337.)

Dr. Selassie next saw Abdur-Razzaaq on March 31, 2008.  He reported a 75 percent reduction in his neck pain, but an increase in his lower back pain.  (Id. at 338.) Approximately one month later, on April 28, 2008, Dr. Selassie noted that Abdur-Razzaaq's lower back pain had decreased, but that his neck pain had now increased.  (Id. at 339.)  To help alleviate this pain, Dr. Selassie administered another steroid injection.  (Id. at 340.)  After one month, Abdur-Razzaaq reported that the injection had reduced his back pain by about fifty percent.  (Id. at 424.)

On August 6, 2008, Dr. Selassie completed a narrative report summarizing Abdur-Razzaaq's progress since 1998.  In that report, she once again opined that Abdur-Razzaaq was "incapable of maintaining any type of gainful employment" and that he was permanently "totally disabled."  (Id. at 412.)  Dr. Selassie continued to treat Abdur-Razzaaq over the next two years, and periodically completed disability certificates, Multiple Impairment Questionnaires, and Workers' Compensation reports reflecting little to no change in her assessment of his prognosis.  (See id. at 413-20, 451, 456, 246-70, 496, 498, 500, 502, 508, 510, 512-14, 516-17, 520-24, 527-28, 530-31, 533-34, 536-37, 539-40, 542-43, 545-46, 548-49, 551-52, 554-55, 557-58, 560-61, 564, 566-67, 569-70, 572-73.)

b.    Settlement Health

Abdur-Razzaaq occasionally received general medical treatment from Settlement Health Clinic, a community health center in East Harlem.  (See id. at 342-69, 462-89.)  Although his records from Settlement Health do not reflect any visits specifically related to his back or neck pain, progress notes from a November 15, 2010 visit report that Abdur-Razzaaq had no tenderness upon palpation of his lumbosacral spine, and had full range of motion in all of his

joints.  (Id. at 475.)  SLR tests performed during that visit, however, were positive on his left side.  (Id.)

       c.       Back and Body Medical Group

On Dr. Selassie's recommendation, Abdur-Razzaaq regularly attended physical therapy at Back and Body Medical Group in Midtown Manhattan.  His first visit for which records have been provided occurred on April 26, 2010, when Abdur-Razzaaq met with Dr. Shan Sivendra, M.D.  Dr. Sivendra noted that Abdur-Razzaaq could flex his cervical spine up to 60 degrees, but had tenderness at the C4, C5, and C6 levels, as well as in the left trapezius and the scapular region.  (Id. at 594.)  In his lumbosacral spine, Abdur-Razzaaq could flex forward up to 70 degrees, but had tenderness at the L5 level.   He also demonstrated bilateral decreased sensation in the S1 nerve root, although it was greater on the left than on the right side.  In Dr. Sivendra's opinion, these symptoms suggested possible cervical and lumbar radiculopathy.  (Id.) He recommended further testing and physical therapy to help alleviate the symptoms.  (Id. at 594-95.)  Abdur-Razzaaq continued to receive physical therapy at Back and Body Medical through January 2011.  (Id. at 598-634.)

     2.     Non-Treating Sources

       a.       Examining Sources

         i.       Dr. Justin Fernando

On May 25, 2007, after Abdur-Razzaaq filed his application for disability benefits, Dr. Justin Fernando, M.D., performed a consultative internal medical exam at the Commissioner's request.  (Id. at 377-80.)  From his report, it appears that Dr. Fernando conducted both a personal interview and a physical examination of Abdur-Razzaaq, but did not

review his medical records.  During his interview with Dr. Fernando, Abdur-Razzaaq reported

that he cooked several times per week, did laundry, went grocery shopping once per week, and

took care of his children and his personal needs daily.  (Id. at 378.)

Upon observing Abdur-Razzaaq, Dr. Fernando noted that he did not appear to be

in acute distress and had no difficulty moving about the room.  His gait was normal, he could

walk on his heels and toes, and could squat halfway to the ground.  His upper and lower

extremities showed no abnormalities, and his SLR tests were negative.  (Id. at 378-79.)  Range of

motion tests revealed a full range of flexion, extension, and rotary movements in his cervical

spine.  He could fully flex his cervical spine in the right lateral direction, but his left lateral

flexion was limited to about 40 degrees.  (Id. at 378.)  He had some cervical tenderness at the

base of his neck, but showed no paracervical tenderness or any evidence of neck spasms.  (Id. at

379.)  Abdur-Razzaaq's thoracic and lumbar spinal flexion was limited to between 45 and 50

degrees, and his extension was limited to about 20 degrees in both directions.  There also was

some mild degree of spasm in the lumbosacral spine, but no spinal or paraspinal tenderness.

(Id.)  An x-ray of Abdur-Razzaaq's lumbosacral spine showed mild dextroscoliosis[8] in the upper

lumbar and lower thoracic spine, but otherwise was unremarkable.  (Id. at 381.)

Following his examination, Dr. Fernando diagnosed Abdur-Razzaaq with chronic

upper, mid, and lower back pain with bilateral subjective radiculopathy.  He reported no

neurological defects, and found no evidence of muscle atrophy or any other muscular

involvement.  Based on his evaluation, Dr. Fernando reported that Abdur-Razzaaq had a

---

[8]     Scoliosis refers to an "abnormal lateral and rotational curvature of the vertebral
column."  Stedman's.  Spinal curvature to the right side of the body is referred to
as "dextroscoliosis."  Id.

"moderate" limitation in his ability to bend and squat, but marked no other functional or ambulatory restrictions.  (Id. at 379.)

ii.      Dr. Stephen G. Zolan

On May 18 and November 9, 2007, and on October 2, 2009, Dr. Stephen Zolan, M.D., conducted a consultative internal medical exam in connection with Abdur-Razzaaq's application for Workers' Compensation benefits.  (Id. at 303-10.)  During an interview with Dr. Zolan, Abdur-Razzaaq indicated that he had injured his back at work in 1998, and subsequently started a new job doing "completely" sedentary work as an office manager at a technology center.  (Id. at 303, 307.)

During his physical examination, Dr. Zolan observed that Abdur-Razzaaq exhibited a normal gait and was able to stand on his heels.  SLR test results were negative on both sides.  He noted, however, that Abdur-Razzaaq's forward flexion, extension, and right and left rotation of his cervical spine all were limited to 20 degrees.  (Id. at 304, 308.)  In the lumbar spine, Dr. Zolan reported that Abdur-Razzaaq's forward flexion was limited to 10 degrees, and that he could not bend laterally in either direction.  (Id.)

After completing his physical examination and reviewing Abdur-Razzaaq's medical records, Dr. Zolan diagnosed Abdur-Razzaaq with chronic cervical and lumbar myofascial pain syndrome with possible myelopathy.[9]  (Id.).  He reported that Abdur-Razzaaq had a "marked partial disability," in that he could not stand or walk for prolonged periods of time and could not lift more than ten pounds.  (Id. at 305.)  However, because he demonstrated

---

[9]      Myelopathy generally refers to disorders of the spinal cord.  Stedman's.

no limitations while sitting, Dr. Zolan opined that Abdur-Razzaaq could perform "light

sedentary" work without restriction.  (Id.)  He characterized Abdur-Razzaaq's prognosis as

"guarded."  (Id. at 304, 308.)

### iii.    Dr. Joseph F. DeFeo

On February 28, 2011, Dr. Joseph F. DeFeo, M.D., performed a consultative

medical exam at Abdur-Razzaaq's request.  (Id. at 636-41.)  Dr. DeFeo observed relatively high

motor strength in Abdur-Razzaaq's upper and lower extremities and found that his sensation was

intact.  He noted, however, that Abdur-Razzaaq had difficulty getting up onto the examining

table and lying down.  Range of motion testing revealed that Abdur-Razzaaq's cervical flexion

was limited to 45 degrees and his extension limited to 10 degrees.  He was able to rotate his neck

20 degrees to the right and 45 degrees to the left before experiencing pain.  His lumbosacral

spinal flexion was limited to 45 degrees, his extension limited to 10 degrees, and his rotation

limited to 10 degrees, with "evidence of paraspinal muscle spasms[,] especially at the extremes

of motion."  (Id. at 638.)  Abdur-Razzaaq's vertex compression test[10] results were positive,

which suggested the presence of foraminal stenosis.  When palpating Abdur-Razzaaq's spine,

Dr. DeFeo observed pain at the L4-L5 and L5-S1 levels, as well as pain in both sacroiliac joints.

(Id.)

---

[10]    The vertex compression test, also referred to as the Spurling test, is used to
evaluate nerve root impingement.  During the test, the patient extends the neck
and rotates and laterally bends the head toward the symptomatic side.  The
examiner then applies an axial compression force through the top of the patient's
head.  The test is considered positive when the maneuver elicits the typical
radicular arm pain.  See Stedman's.

Based on his examination, Dr. DeFeo diagnosed Abdur-Razzaaq with chronic permanent spondylosis of the cervical and lumbosacral spine with secondary radiculopathy in both upper and lower extremities, which resulted in muscle weakness and functional deficits in the limbs.  (Id. at 640.)  He recommended that Abdur-Razzaaq avoid lifting, carrying, repetitive bending, working overhead, and standing, walking and sitting for extended periods of time.  (Id. at 641.)  Specifically, Dr. DeFeo stated that Abdur-Razzaaq could sit and stand for no more than two hours total, and could sit for no more than an hour at a time before taking a five to ten minute break.  (Id. at 645.)  He indicated that Abdur-Razzaaq's pain would be severe and constant enough to interfere with his attention and concentration, and that he likely would miss work more than three times per month.  (Id. at 646-47.)  Ultimately, he opined that these limitations would preclude Abdur-Razzaaq from engaging in any gainful employment in an active workforce.  (Id. at 641.)

b.    Non-Examining Medical Experts

i.    Dr. Warren Cohen

Dr. Warren Cohen, M.D., testified as a medical expert at Abdur-Razzaaq's first administrative hearing on August 6, 2008.  Dr. Cohen did not personally examine Abdur-Razzaaq, but did review his medical records to determine the extent of his disability, if any.  (Id. at 80-81.)  Based on his review of the records, Dr. Cohen surmised that Abdur-Razzaaq had cervical and lumbar degenerative discogenic disease, which did not meet the criteria for any of the listed impairments in the SSA Regulations.  (Id. at 80.)  After testifying to that opinion, the ALJ asked Dr. Cohen to consider a hypothetical individual with a similar condition.  Dr. Cohen opined that such an individual would retain the residual functional capacity ("RFC") to lift up to

twenty pounds only occasionally, but up to ten pounds frequently.  He further testified that the proposed hypothetical individual would be capable of standing and walking for up to four hours per day, and sitting for about six hours a day.  (Id.)

ii.    Dr. Charles M. Plotz

Dr. Charles M. Plotz, M.D., testified as a medical expert at Abdur-Razzaaq's second hearing in March 2011.  Like Dr. Cohen, Dr. Plotz did not personally examine Abdur-Razzaaq, but merely reviewed his medical records for purposes of rendering an expert opinion. Dr. Plotz testified that Abdur-Razzaaq suffered from "severe" back pain with two herniated intervertebral discs, one at the L5-S1 level, and one at the C5-C6 level.  In Dr. Plotz's opinion, the cervical herniation could have accounted for Abdur-Razzaaq's occasional headaches and upper back pain.  (Id. at 108.)  Unlike Dr. Selassie, Dr. Plotz opined that Abdur-Razzaaq did not suffer from radiculopathy because he did not show any neurological symptoms related to disc abnormalities.  (Id. at 109.)  He did, however, concede that Abdur-Razzaaq's S1 nerve root likely was occasionally involved in bringing about his left leg pain.  (Id. at 112.)

When asked to consider a hypothetical individual with conditions similar to Abdur-Razzaaq, Dr. Plotz indicated that such a person would have the RFC to stand and walk for about six hours, sit for about six hours during an eight hour work day, and lift up to twenty pounds.  (Id. at 110.)  Ultimately, he found that Abdur-Razzaaq's subjective complaints regarding his inability to work a full-time sedentary job were not consistent with his objective findings.  (Id. at 109-10.)

C.    Vocational Expert Testimony

1.    Stephen Feinstein

During the first administrative hearing, vocational expert Stephen Feinstein, Ed.D., testified as to Abdur-Razzaaq's potential job prospects.  The ALJ asked Feinstein to consider a hypothetical individual with the same age, education, work experience and functional limitations as Abdur-Razzaaq, and to testify as to whether there existed any "sedentary" and/or "light" jobs that such an individual could perform.  Feinstein testified that such an individual could work as an assembler, a packager, or a surveillance system monitor, so long as those jobs provided a sit/stand option.  (Id. at 82.)  He acknowledged, however, that the hypothetical individual would not be able to sustain gainful employment in those jobs if he needed to take fifteen-minute breaks every fifteen minutes.  (Id. at 83.)

2.    Edna Clark

Edna Clark testified as a vocational expert at Abdur-Razzaaq's second administrative hearing.  Clark opined that a hypothetical person with Abdur-Razzaaq's same age, education, work experience and RFC could work as a surveillance system monitor, for which there existed 34,000 jobs nationally and 1,900 locally, a call out operator, for which there existed 11,000 jobs nationally and 5,500 locally, or a cashier, for which there existed 150,000 jobs nationally and 4,500 locally.  (Id. at 113-14.)  She conceded, however, that none of those jobs would give an individual the option to walk away from the workstation for ten to fifteen minutes every hour.  (Id. at 115.)

D.     The ALJ's Decision

In his decision dated March 24, 2011, ALJ Levin found that Abdur-Razzaaq was not disabled within the meaning of the Act and, therefore, denied his claim for disability benefits.  (Id. at 22-30.)  In reaching that conclusion, the ALJ applied the five-step sequential analysis required by 20 C.F.R. §§ 416.1520 and 416.920.

At Step One, the ALJ determined that Abdur-Razzaaq had not engaged in substantial gainful activity since November 6, 2005, the onset date of his alleged disability.  (Id. at 28.)

At Step Two, the ALJ found that the combination of discogenic and degenerative disease in Abdur-Razzaaq's cervical and lumbosacral spines qualified as a "severe impairment" under the Regulations.  (Id. at 29.)

Turning to Step Three of the analysis, the ALJ determined that although Abdur-Razzaaq's condition qualified as a severe impairment under Step Two, it plainly did not "meet[] or medically equal" any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  (Id.)  Accordingly, the ALJ proceeded to Step Four of the analysis.

At Step Four, the ALJ assessed Abdur-Razzaaq's RFC and found that he retained the capacity to lift/carry up to twenty pounds occasionally and ten pounds frequently, to stand and walk for up to four hours in an eight hour workday, and to sit for up to six hours in an eight hour workday.  (Id. at 29.)  He thus concluded that Abdur-Razzaaq could perform "light" or "sedentary" work, so long as he had the option to alternate between sitting and standing as needed, and so long as the work tasks were simple and routine.  (Id. at 28.)

In reaching this conclusion, ALJ Levin reviewed Abdur-Razzaaq's medical and nonmedical history, including his hearing testimony.  (Id. at 24-28).  ALJ Levin ultimately concluded that although Abdur-Razzaaq's condition could reasonably be expected to produce his alleged symptoms, his claimed limitations went beyond what would reasonably expected of a person with his diagnoses and conditions.  (Id. at 28.)  The ALJ noted that Abdur-Razzaaq had been attending school as a full-time student for a significant period of time and was able to endure the long drive to and from school.  And although Abdur-Razzaaq had indicated that he could not take his medication on school days because it made him drowsy and impaired his ability to concentrate, the ALJ noted that he had taken his medication before the second hearing and nonetheless appeared quite focused and articulate.  In fact, as the ALJ noted, Abdur-Razzaaq came very close to admitting that he had the capacity to perform at least some physically undemanding work activity by testifying that he could walk up to one mile, lift and carry twenty pounds, stand for about two hours at a time, and sit for two hours at a time three or four times per day.  In sum, the ALJ found that neither the objective medical evidence nor Abdur-Razzaaq's own testimony was consistent with his purported level of functional compromise.  (Id. at 27-28.)

In coming to his conclusion at Step Four, ALJ Levin specifically credited  the opinions of Drs. Plotz and Cohen, who both testified that a person with Abdur-Razzaaq's medically-determinable impairments could not reasonably be expected to experience the level of limitation that Abdur-Razzaaq had asserted.  He also partially credited the opinions of Dr. Selassie, but only to the extent that they were based on her objective medical observations rather than Abdur-Razzaaq's subjective complaints.  (Id. at 27.)

Although the ALJ determined that Abdur-Razzaaq retained the RFC to perform light or sedentary work with a sit/stand option, he ultimately concluded that Abdur-Razzaaq could not perform his "past relevant work" because that work had exceeded his exertional capacities.  He thus turned to Step Five to consider whether, despite his spinal disease, Abdur-Razzaaq was capable of performing jobs that existed in sufficient numbers in the national economy, given his age, education, and work experience.  Crediting the vocational experts' testimony, the ALJ concluded that Abdur-Razzaaq could work as a surveillance system monitor, a call out operator, a cashier, an unskilled assemblyman, or a packager, all which involved light or sedentary work and provided an option to sit or stand when needed.  (Id. at 28-29.)

Based on all of these considerations, the ALJ concluded that Abdur-Razzaaq was not disabled within the meaning of the Act.  (Id. at 29.)

D.      Appeals Council

On May 11, 2011, Abdur-Razzaaq filed a request for review of ALJ Levin's March 24, 2011 decision.  (Id. at 13, 16-17.)  Upon considering that application, the Appeals Council found no basis for granting review.  (Id. at 1-2.)  Thus, on August 15, 2012, the ALJ's ruling became the final decision of the Commissioner.  (Id.)

III.    Discussion

A.      Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents

of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir.

1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

 The Act, in turn, provides that "[t]he findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C.

§ 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41,

46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming,

but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401

(1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

 A district court is not permitted to review the Commissioner's decision de novo.

Halloran v. Barnhart, 362 F.3d 28, 31 (2d. Cir. 2004) (citing Schaal v. Apfel, 134 F. 3d 496, 501

(2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, the court's inquiry is

limited to ensuring that the Commissioner applied the correct legal standard and that his decision

is supported by substantial evidence.  See Hickson v. Astrue, No. 09 Civ. 2049 (DLI) (JMA),

2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011).  When the Commissioner's determination is

supported by substantial evidence, the decision must be upheld, "even if there also is substantial

evidence for the plaintiff's position."  Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y.

2001).  This means that the ALJ's factual findings may be set aside only if a reasonable

factfinder would have had to conclude otherwise.  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d

443, 448 (2d Cir. 2012).

B.     Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks, ellipsis, and brackets omitted).  Indeed, an ALJ's failure to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding the case.  Id. at 114-15.  When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information.  Schaal, 134 F.3d at 505; Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1512(e), (e)(1)).  The ALJ may do this by requesting copies of the claimant's medical source's records, a new report, or a more detailed report from the medical source.  Jimenez v. Colvin, No. 11 Civ. 4599 (DRH), 2013 WL 1332630, at *8 (E.D.N.Y. Mar. 31, 2013).

C.     Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A).  In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920 (the "Regulations").  The Second Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.   If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.   If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.   If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the [RFC] to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of the process.  Berry, 675 F.2d at 467.  If the Commissioner finds that a claimant is disabled (or not disabled) at an early step in the process, he is not required to proceed with any further analysis. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work.  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the

claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212,

216 (2d Cir. 1980).

     D.     Treating Physician Rule

     The "treating physician rule" requires an ALJ "to grant controlling weight to the

opinion of the claimant's treating physician[11] if the opinion is well supported by medical

findings and is not inconsistent with other substantial evidence." Rosado v. Barnhart, 290 F.

Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)). As the

Second Circuit has explained, a treating physician's opinion is typically accorded special

consideration because of the "continuity of treatment he provides and the doctor/patient

relationship he develops" with the claimant, which "place[s] him in a unique position to make a

complete and accurate diagnosis of his patient." Monegur v. Heckler, 722 F.2d 1033, 1039 n.2

(2d Cir. 1983).

     Nonetheless, the Commissioner need not grant "controlling weight" to a treating

physician's opinion as to the ultimate issue of disability, as this decision lies exclusively with the

Commissioner. See 20 C.F.R. § 404.1527(d); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)

("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

Likewise, the Second Circuit has acknowledged that "[i]t is an accepted principle that the

opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the

report of the consultative physician may constitute such evidence." Monegur, 722 F.2d at 1039

---

     [11]     The Regulations define a "treating source" as any "physician, psychologist, or
other acceptable medical source who provides . . . medical treatment or evaluation
and who has . . . an ongoing treatment relationship with [the claimant]." 20
C.F.R. § 416.902.

(internal citations omitted).  The Commissioner must, however, always provide "good reasons"

for the weight, if any, he gives to the treating source's opinion.  20 C.F.R. § 404.1527(c)(2).

IV.     Application of Law to Facts

        A.      Disability Analysis

                The question presented by the cross-motions is whether the ALJ's decision is

legally correct and supported by substantial evidence.  Abdur-Razzaaq asks this Court to reverse

the ALJ's decision, or alternatively, to remand for a new hearing, on the grounds that the ALJ:

(1) failed to follow the treating physician rule and instead relied on the opinions of Drs. Cohen

and Plotz, the two non-examining medical experts; and (2) failed to properly evaluate Abdur-

Razzaaq's credibility in determining his RFC.  (Pl.'s Mem. 17-25.)  The Commissioner disputes

both of these assertions.  (ECF No. 15 ("Comm'r's Mem.") at 1.)

        1.      First Step

                The first step of the sequential analysis requires the ALJ to determine whether the

claimant has engaged in substantial gainful activity during the period at issue.  20 C.F.R.

§ 404.1520(a)(4)(i).  The ALJ here determined that Abdur-Razzaaq had not engaged in

substantial gainful activity since November 6, 2005, the onset date of his alleged disability.  (Tr.

28.)  That finding benefits Abdur-Razzaaq and is consistent with all of the evidence in this case.

        2.      Second Step

                The second step of the sequential analysis requires the ALJ to assess the medical

severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe

if it significantly limits the claimant's physical or mental ability to perform basic work activities.  Id. § 404.1520(c).  At this step, the ALJ does not take into consideration the claimant's age, education, or work experience.  Id.

The ALJ properly determined that Abdur-Razzaaq suffered from a combination of discogenic and degenerative disease in his cervical and lumbosacral spines, which constituted a severe impairment under the Regulations.  (Tr. 29.)  This finding, too, benefits Abdur-Razzaaq, and neither party appears to challenge it.  It also is consistent with all of the objective medical evidence and the medical expert testimony.

### 3.   Third Step

An ALJ who determines that a claimant suffers from at least one "severe" impairment must proceed to the third step of the sequential analysis.  The third step requires the ALJ to determine whether the claimant has an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  See 20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ must base her decision solely on medical evidence, without regard to the claimant's age, education, or work experience.  Id. § 404.1520(d).  If the ALJ finds that the claimant has an impairment that meets or equals a condition listed in Appendix 1, the claimant is considered disabled within the meaning of the Act.  Id. § 404.1520(a)(4)(iii), (d).  If the claimant's impairment does not meet the criteria in Appendix 1, the ALJ must continue to the next step of the analysis.

Abdur-Razzaaq's back and neck impairments would have been evaluated under Section 1.04 of Appendix 1, which pertains to "Disorders of the Spine."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.  To meet this listing, a claimant must demonstrate that his

impairment falls into one of the Listing's three subsections, which, in turn, require a claimant to show:

> A.     Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B.     Spinal arachnoiditis,[12] confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia,[13] resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.     Lumbar spinal stenosis resulting in pseudoclaudication,[14] established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Appendix 1, § 1.04(A)-(C).

ALJ Levin concluded that Abdur-Razzaaq's back and neck problems did not meet or medically equal the criteria listed in Section 1.04.  (Tr. 29.)  Although he did not discuss this determination in great detail, neither party contests his findings.  Moreover, even a cursory

---

[12]    Spinal arachnoiditis is defined as an inflammation of the membrane covering the spinal cord.  See Stedman's.

[13]    Dysesthesia is defined as impairment of any sense, especially that of touch. The Sloane-Dorland Annotated Medical-Legal Dictionary 233 (1987) ("Dorland's").

[14]    Pseudoclaudication involves an aggregation of symptoms characterized by absence of pain or discomfort in a limb when at rest, commencement of pain, tension, and weakness after one begins walking, intensification of the pain until walking becomes impossible, and disappearance of the symptoms after a period of rest.  Dorland's at 147.

glance at the record provides substantial support for the ALJ's conclusion at this step. Although MRI testing showed disc herniation in Abdur-Razzaq's cervical and lumbosacral spine, he did not have the type of muscle weakness and sensory or reflex loss that typically results from nerve root compression, as required under Subsection A. (See id. at 304, 308, 575, 638.) Nor did any of his treating or non-treating physicians observe the type of spinal cord inflammation associated with spinal arachnoiditis, as would be required to satisfy Subsection B. In addition, the record amply demonstrates that Abdur-Razzaaq was able to ambulate effectively, thereby precluding a finding of disability under Subsection C. For example, Abdur-Razzaaq's treating and non-treating physicians alike all observed a normal gait and station, (id. at 304, 308, 378, 441, 443, 452, 458, 460), and both testifying medical experts opined that he could walk for several hours at a time, (id. at 80, 110). Indeed, Abdur-Razzaaq himself admitted at his second hearing that he could stand for about two hours at a time and could walk at least one mile. (Id. at 100-101.)

Since Abdur-Razzaaq's condition plainly did not satisfy any of the criteria listed in Section 1.04, the ALJ properly proceeded to the fourth step of the sequential analysis.

4.     Fourth Step

At the fourth step, the ALJ must determine the claimant's RFC, or the functions the claimant is able to perform despite his impairments, while considering the relevant medical or other evidence from the case record. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

The analysis at this level involves a two-part inquiry. Murphy v. Barnhart, No. 00 Civ. 9621 (JSR) (FM), 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003). First, the ALJ must

consider whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms alleged by the claimant.  Sarchese v. Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b).  Then, if the claimant makes statements about his symptoms that are not substantiated by objective medical evidence, the ALJ must evaluate the claimant's credibility and determine the extent to which his symptoms truly limit his ability to perform basic work activities.  Sarchese, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *1.  A federal court must afford great deference to the ALJ's credibility finding so long as it is supported by substantial evidence.  Bischof v. Apfel, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination [as to claimant's credibility] because he heard [claimant's] testimony and observed his demeanor.").

a.      Credibility Determination

In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony.  Lugo v. Apfel, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998); SSR 96-7p, 1996 WL 374186, at *4.  The Regulations require the ALJ to consider not only the objective medical evidence, but also

> [(a) t]he individual's daily activities; [(b) t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; [(c) f]actors that precipitate and aggravate the symptoms; [(d) t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; [(e) t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; [(f) a]ny measures other than treatment the individual uses or has used to relieve pain or

> other symptoms . . . ; and [(g) a]ny other factors concerning the
> individual's functional limitations and restrictions due to pain or
> other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)); see also

Sarchese, 2002 WL 1732802, at *7 (listing factors).

      Here, the ALJ concluded that Abdur-Razzaaq's condition could reasonably be

expected to cause some functional limitations, but that his claim of total disability was "not fully

credible" in light of the evidence on the record.  (Tr. 29.)  Abdur-Razzaq contends that this

credibility determination was "devoid of analysis" and therefore was legally insufficient.

However, a full reading of the "Rationale" section of the ALJ's decision reveals ample analysis

to support his adverse credibility determination.  Indeed, as the ALJ noted, Abdur-Razzaaq

himself "came very close to admitting that he has the functional capacity to perform at least

some physically undemanding work activity" when he testified that he could walk at least one

mile, lift and carry up to twenty pounds, stand for about two hours at a time, and sit for two

hours at a time about three or four times a day.  (Id. at 27-28.)  While it is true that "a claimant

need not be an invalid to be found disabled under the Social Security Act," (see Pl.'s Mem. at 25

(quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998))), these admissions certainly

provided sufficient reason to discount Abdur-Razzaq's claim that he could not meet the physical

demands of a full-time job.

      As additional support for his credibility determination, the ALJ noted that Abdur-

Razzaaq regularly drives long distances to and from school without any reported difficulty,

thereby suggesting that he can endure prolonged periods of sitting.  (Tr. 27.)  Further, although

Abdur-Razzaaq had seemed to suggest that he would not be able to take his pain medication while working because it impaired his ability to concentrate, the ALJ noted that he had taken his medication on the morning of the hearing, and yet still appeared perfectly focused and coherent. (Id.)  Finally, the ALJ referred to the opinions of Drs. Plotz and Cohen, who both testified that Abdur-Razzaaq's claimed limitations went "beyond anything that might reasonably be expected of a person with his diagnoses."  (Id.)   Based on these observations, the ALJ reasonably discounted Abdur-Razzaaq's subjective complaints regarding his level of physical disability.

Abdur-Razzaaq finally argues that the ALJ's adverse credibility determination conflicts with his later finding that Abdur-Razzaaq could not perform his past relevant work. This contention likewise lacks merit.  The fact that the ALJ discounted some of Abdur-Razzaaq's complaints regarding his physical limitations does not mean that he discounted every subjective claim made on the record.  Indeed, in his first decision, dated September 30, 2008, the ALJ "accept[ed] that[,] given his frequent pain, [Abdur-Razzaaq] would not be able to perform the mental requirements of the former jobs he had that were of a sedentary nature," and further acknowledged that "his more physically demanding work is obviously 'out.'"  (Id. at 157.) Since Abdur-Razzaaq's pain levels had not significantly changed by the time of the second hearing, the ALJ "continue[d] to find that [he] lack[ed] the ability to return to his 'past relevant work.'"  (Id. at 28.)  That finding is perfectly consistent with the conclusion that Abdur-Razzaaq's complaints, in other respects, were not fully credible.

b.    RFC Determination

After considering all of the objective medical evidence and appropriately rejecting certain of Abdur-Razzaaq's subjective complaints, the ALJ concluded that Abdur-

Razzaaq had the RFC to perform "light" or "sedentary" work involving simple, routine tasks, so long as he had the option to alternate between sitting and standing when needed.  (Id. at 29.)  In reaching this conclusion, the ALJ generally credited the opinions of Drs. Cohen and Plotz, who found that Abdur-Razzaaq had the ability to lift and carry up to twenty pounds occasionally and ten pounds frequently, to stand and walk for up to four hours a day, and to sit for up to six hours a day.  (Id. at 27.)  He also relied on Abdur-Razzaaq's own hearing testimony, in which he acknowledged that he could lift and carry up to twenty pounds, sit for two hours at a time about three or four times a day, walk up to one mile, and stand for about two hours at a time.  (Id. at 27-28.)  He declined, however, to credit Dr. DeFeo's opinion in its entirety, since his disability findings went beyond even those of Abdur-Razzaaq's treating physician, Dr. Selassie, and because his credibility was suspect given that he frequently was retained by Abdur-Razzaaq's counsel and always opined that their clients were disabled.  (Id. at 27.)  In addition, although he did not expressly reject Dr. Selassie's findings, he did scrutinize their reliability since they relied in significant part on Abdur-Razzaaq's own subjective complaints.  (Id.)

Abdur-Razzaaq argues that the ALJ erred in discounting Dr. Selassie's opinions merely because they relied on his own subjective complaints.  Indeed, as Abdur-Razzaaq accurately notes, "[u]nder appropriate circumstances, the subjective experience of pain can support a finding of disability."  (Pl.'s Mem. at 18 (quoting Snell, 177 F.3d at 135).)  These, however, are not such circumstances.  Although Abdur-Razzaaq subjectively claimed to experience so much pain that he could not perform even sedentary work, his own testimony belied those complaints.  Even setting aside any clinical findings and diagnostic test results, it is clear that Abdur-Razzaaq retained at least some degree of work potential, and therefore was not "totally disabled," contrary to what Dr. Selassie repeatedly opined.  Abdur-Razzaaq's

admissions alone would have provided sufficient justification to discount his treating physician's opinion.

The contradictions, however, did not stop there.  Dr. Selassie's total disability finding conflicted not only with Abdur-Razzaaq's own hearing testimony, but also with the findings and opinions of four other physicians involved in this case.  Dr. Fernando, one of the examining consultative physicians, found that Abdur-Razzaaq had only "moderate" limitations in his ability to bend over, and could squat only halfway, but otherwise had no functional impairments.  (Tr. 379.)  Dr. Zolan opined that Abdur-Razzaaq was only "partially disab[led]" in that he likely could not tolerate prolonged periods of standing or walking, and could not lift more than ten pounds.  (Id. at 305.)  Notably, that diagnosis did not preclude Abdur-Razzaaq from performing light or sedentary work that did not involve heavy lifting or prolonged periods of standing and walking.  Finally, after reviewing Abdur-Razzaaq's medical history and considering his hearing testimony, both Drs. Cohen and Plotz concluded that Abdur-Razzaaq had the ability to perform light and sedentary work with a sit/stand opinion.  (Id. at 80, 110.)  In light of the overwhelming evidence in conflict with Dr. Selassie's "total disability" assessment, the ALJ was not required to defer to her opinion.

Abdur-Razzaaq further contends that the ALJ improperly relied on the opinions of the non-examining testifying experts, Drs. Cohen and Plotz, in reaching his RFC determination.  This contention likewise is without merit.  Although it is true, as Abdur-Razzaaq asserts, that a non-examining medical expert's opinion does not, by itself, constitute sufficient evidence to disregard a treating physician's opinion, the ALJ here did not solely rely on the medical experts' opinion in reaching his RFC determination.  Rather, he relied in large part on

Abdur-Razzaaq's own admissions.  Those admissions themselves provided substantial support

for the opinions of Drs. Cohen and Plotz, which then had sufficient backing to supplant Dr.

Selassie's opinion.  See Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010)

(opinions of non-examining sources may override treating sources' opinions so long as they are

supported by sufficient evidence in the record).

In sum, ALJ Levin applied the correct legal procedures at Step Four and reached

a conclusion that was supported by substantial evidence.  He thus correctly proceeded to the fifth

step in the sequential analysis.

### 5.   Fifth Step

At the fifth step, the ALJ must assess the claimant's RFC and determine whether,

based on the claimant's age, education, and work experience, the claimant could "make an

adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  As part of this analysis, the ALJ

must determine whether there are jobs in the national economy that the claimant could perform.

SSR 83-10, 1983 WL 31251, at *4 (1983).  In an "ordinary case," when the claimant has only an

exertional impairment,[15] the ALJ may meet this burden by applying the Medical-Vocational

Guidelines, also known as the Grids.  Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986); see also

SSR 83-11, 1983 WL 31252, at *1 (1983) (use of Grids to direct conclusion of "disabled" or

"not disabled" allowed only when criteria of a rule in the Grids are "exactly met").  When a

---

[15]     "Exertional limitations" are "limitations and restrictions imposed by [a
claimant's] impairment(s) and related symptoms" that affect his "ability to meet
the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing,
and pulling)."  20 C.F.R. § 404.1569a(b).

claimant experiences nonexertional limitations,[16] the ALJ, in certain situations, cannot satisfy this burden through use of the Grids alone, and must instead introduce the testimony of a vocational expert.  Bapp, 802 F.2d at 605-07.

Since Abdur-Razzaaq's impairments limited not only his exertional abilities, but also his postural abilities (i.e. his ability to endure long periods of sitting without changing position), ALJ Levin properly relied on the vocational experts' testimony in determining whether Abdur-Razzaaq could adjust to other jobs that exist in significant numbers in the national and regional economies.  Clark testified that a hypothetical person of Abdur-Razzaaq's age, education, past work experience, and RFC could work as an surveillance system monitor, for which there existed 34,000 jobs nationally and 1,900 jobs regionally; a call out operator, for which there existed 11,000 jobs nationally and 5,500 regionally; and a cashier, with reduced numbers, for which there existed 150,000 jobs nationally and 4,500 jobs regionally.  (Tr. 113-14.)  Based on this testimony, the ALJ concluded that Abdur-Razzaaq was capable of performing jobs that existed in significant numbers in the national economy, and thus was not disabled.  (Id. at 28.)

Neither party here disputes any aspect of the ALJ's Step Five determination. Because the vocational experts' testimony was substantial evidence upon which the ALJ could base his disability determination, his decision at this step was not erroneous.  See Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983); Daniels v. Astrue, No. 10 Civ. 6510 (RWS), 2012 WL 1415322, at *17 (S.D.N.Y. Apr. 18, 2012).

---

[16]     "Nonexertional limitations" include, inter alia, most mental impairments, such as depression, anxiety, and inability to concentrate.  20 C.F.R. § 404.1569a(c)(1); SSR 85-15, 1985 WL 56857, at *2 (1985).

V.        <u>Conclusion</u>

        For the foregoing reasons, Abdur-Razzaaq's motion for judgment on the

pleadings (ECF No. 12) is denied, and the Commissioner's cross-motion for judgment on the

pleadings (ECF No. 14) is granted.

        The Clerk of Court is requested to enter judgment in favor of the Commissioner

and to close this case.

        SO ORDERED.

Dated:      New York, New York
            March 18, 2014


                                  _____/S_____
                                LAURA TAYLOR SWAIN
                                United States District Judge